IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VICTOR McWILLIAMS | : CIVIL ACTION |
| | : |
| v. | : |
| | : NO. 14-4783 |
| COMMUNITY EDUCATION | : |
| CENTERS, INC. | : |

KEARNEY, J.                                                                                  OCTOBER 21, 2015

## MEMORANDUM

An African American prison corrections officer alleging his former prison employer terminated his employment based on race discrimination must show specific facts demonstrating pretext in the prison's decision to impose disparate termination discipline upon him for violating an allegedly inapposite or vague "fraternization" policy. For a jury to resolve factual disputes on a hostile work environment claim, he must show the hostility towards him and other African American corrections officers is sufficiently severe or pervasive as known to him during his employment to alter the conditions of his employment and create an abusive working environment.

After vigorous discovery, we deny the prison employer's motion for summary judgment on the race discrimination and the hostile work environment claims. The former corrections officer adduced sufficient evidence of genuine issues of material fact to warrant the jury's credibility findings and defeat the prison's summary judgment motion as to his race discrimination claim. We also deny the prison's motion on the hostile environment claim after evaluating a totality of circumstances, including most notably photographs of African American colleagues in a noose and facts evidencing the African American correction officer's awareness

of a severe or pervasive hostile work environment at the time his employer terminated his employment.

I. **Undisputed Material Facts**[1]

Victor McWilliams ("McWilliams") worked as a prison corrections officer ("CO" or "officer") for Defendant Community Education Center a/k/a George W. Hill Correctional Facility or Delaware County Prison ("CEC" or "Prison") from January 1, 2009 until CEC terminated his employment on January 30, 2013. CEC SUMF at ¶1. A Collective Bargaining Agreement ("CBA") between CEC and the Delaware County Prison Employees Independent Union ("Union") governed McWilliams' employment with CEC. CEC SUMF at ¶14. As a CO, McWilliams, *inter alia*, "oversees and maintains custody, care and control of inmates or detainees of a facility, while enforcing rules, regulations, policies and procedures of the company and contracting agency" and "oversees and monitors the activities of the inmates or detainees in living areas, recreation activities areas, dining areas and visitation areas." J.A. 23; CEC SUMF at ¶32.

In December 2012, McWilliams worked in the Prison Unit 8-C where he came in contact with inmate J.H. CEC SUMF at ¶¶ 37-38. McWilliams began talking to J.H. about his Prison account, specifically J.H.'s "inability to get his family to put money in his account." J.A. 142. In late December 2012, McWilliams offered to help J.H. because he did not want to "see [J.H.] depressed." *Id.* J.H. asked McWilliams to contact J.H.'s daughter to deposit money into J.H.'s

---

[1] The Court's Policies require that a Statement of Undisputed Material Facts ("SUMF") be filed in support of a Fed.R.Civ.P. 56 motion as well as an appendix of exhibits or affidavits. CEC filed its SUMF at ECF Doc. No. 48-3 ("CEC SUMF"). CEC filed a "Joint Appendix" at ECF Doc. No. 48-4 through 48-6. McWilliams responded to CEC's SUMF at ECF Doc. No. 49-11 referred to as "McWilliams' SUMF." McWilliams added documents to the "Joint Appendix" at ECF Doc. No. 49-3 through 49-6, and the affidavits of Roslynn Simmons (ECF Doc. Nos. 49-7, 49-8) and Frank Kwaning (ECF Doc. No. 49-9). References to exhibits in the appendices shall be referred to by Bates number, for example, "Joint Appendix (J.A.) 1."

2

Prison account. *Id.* J.H. gave McWilliams a handwritten note containing J.H.'s bank account number, bank routing number, the amount to be deposited, and the phone number of his daughter. J.A. 142-43. McWilliams did not turn the information over to J.H.'s Prison counselor. J.A. 143-44. After leaving his shift, McWilliams called the telephone number provided by J.H. and eventually spoke with J.H.'s daughter and relayed the financial information. J.A. 144-45. When McWilliams returned to work the next day, he told J.H. about the phone call. J.A. 145. Later that day, J.H. told McWilliams money had been deposited in his account. *Id.*

On January 4, 2013, J.H. submitted to the Prison a handwritten statement on a form entitled "Inmate Interview Sheet." J.A. 24.[2] J.H. reported he gave his bank information to McWilliams. *Id.* CEC investigated the incident, and prepared a memorandum entitled "Investigative Incident Involving Correctional Officer Victor McWilliams." J.A. 25-27. When questioned, McWilliams admitted obtaining J.H.'s bank account information. CEC SUMF at ¶54. On January 30, 2013, CEC terminated McWilliams for obtaining bank account information from an inmate in violation of CBA Section 13.04 (E) and Policy 300.27 ¶¶ 22, 44. CEC SUMF at ¶ 70.[3] According to the Prison, a CO who obtains an inmate's banking information constitutes

---

[2] CEC characterizes the January 4, 2013 "Inmate Interview Sheet" as an "incident report" filed by J.H. *See* CEC SUMF at ¶42. McWilliams disputes this, objecting to the document because, *inter alia*, there is "no evidence that any inmate created this document." *See* McWilliams SUMF at ¶42. The handwritten "Inmate Interview Sheet" is illegible in parts. *See* J.A. at 24.

[3] Both the CBA and CEC's Progressive Performance Counseling and Appeal Policy 300.27 ("Policy 300.27") provide a multi-step progressive disciplinary process for CEC employees. CEC SUMF at ¶15; J.A. 16-22, 61-94. The two provisions on which CEC terminated McWilliams in the CBA and Policy 300.27 provide:

> CBA:
>
> 13.04 An employee who engages in or actively conspires to engage in the following activities may be subject to immediate suspension or discharge.
> . . .

"fraternization" violative of both the CBA §13.04(E) and Policy 300.27, ¶¶ 22, 24. J.A. 679-81 at ¶¶ 26-30 (Affidavit of CEC Warden David Byrne).

Following our April 7, 2015 Order on CEC's motion to dismiss, McWilliams proceeds on two claims: his termination is a result of race discrimination and the Prison constituted a hostile work environment under Title VII and the Pennsylvania Human Relations Act ("PHRA"). CEC moves for summary judgment on both claims,[4] and in its Reply brief (ECF Doc. No. 50), seeks the dismissal of punitive damages.[5]

---

> E. Forming a romantic, sexual, business or other unauthorized relationship with inmates.
>
> 13.05 Disciplinary sanctions for less serious violations will be progressive in nature and consist of:
>
> . . .
>
> Discharge: The result of a serious breach of a rule, standard, practice, policy, procedure or as a result of repeated disciplinary problems.

CEC's SUMF at ¶17; J.A. at 75-77.

> Policy 300.27 attaches a "list of violations" including:
>
> 22. Behavior, to include off duty conduct, which renders continued employment contrary to the best interest of CEC (must be clearly stated).
>
> 44. Accepting money, goods or favors from detainees.

J.A. 20-21.

[4] Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(a). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On a motion for summary judgment, the court must consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted). If the movant carries its initial burden of showing the basis of its motion, the burden shifts to the non-moving party to go beyond the pleadings and point to "specific facts showing that a genuine issue exists for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). In other words, the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (citation and internal quotation marks omitted). Summary judgment must be granted against a non-moving party

4

**II.     Analysis**

   **A. McWilliams adduced evidence of race discrimination sufficient to create a genuine issue of material fact.**

Title VII, 42 U.S.C. § 2000e-2(a), and the PHRA, 43 Pa. Stat. § 955(a), "prohibit[] discrimination in employment on the basis of an employee's race." *Daniels v. School Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015).[6] We analyze race discrimination claims under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Id.* (internal citations omitted). We first determine whether McWilliams states a *prima facie* case of discrimination; if he has, we ask whether CEC advanced a legitimate non-discriminatory reason for its conduct; and, if CEC has done so, the burden shifts back to McWilliams to prove that CEC's proffered reason is pretextual. *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 325-26 (3d Cir. 2015) (citing *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)).

   *McWilliams makes a prima facie showing of race discrimination.*

To show a *prima facie* case of Title VII race discrimination, McWilliams must (a) belong to a protected class, (b) be qualified for the position, (c) suffer an adverse employment action which (d) occurred under circumstances that raise an inference of discrimination. *See Sarullo v.*

---

who fails to sufficiently "establish the existence of an essential element of its case on which it bears the burden of proof at trial." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

[5]  We deny CEC's motion on punitive damages under Title VII. Under 42 U.S.C. §1981a(b)(1): "[a] complaining party may recover punitive damages ... if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. §1981a(b)(1). We find questions of fact precluding summary judgment on McWilliams' claims and will deny for now CEC's motion on punitive damages under Title VII without prejudice to CEC to renew under Fed.R.Civ.P. 50. *See Donlin v. Philips Lighting No. Amer. Corp.*, 581 F.3d 73, 79 n.2 (3d Cir. 2009). However, McWilliams may not recover punitive damages under the PHRA. Punitive damages are not available under the PHRA. *Berkowitz v. Oppenheimer Precision Products, Inc.*, No. 13-4917, 2014 WL 5461515, *9 (E.D. Pa. Oct. 28, 2014) (citing *Hoy v. Angelone*, 720 A.2d 745, 749-50 (Pa. 1998)).

[6]  Courts analyze PHRA claims coextensively with Title VII claims. *Daniels*, 776 F.3d at 193 (citing *Burton v. Teleflex Inc.*, 707 F.3d 417, 432 (3d Cir. 2013)); *see also Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996).

5

*U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003); *see also*, *Jones*, 796 F.3d at 327. CEC's summary judgment motion contests only the last element, asserting there is no evidence CEC terminated McWilliams under circumstances giving rise to an inference of discrimination. CEC asserts it properly terminated McWilliams after it conducted a full investigation into McWilliams' conduct, McWilliams' admitted he obtained J.H's banking information, and concluded McWilliams' conduct constituted grounds for immediate termination under §13.04(E) of the CBA and Policy 300.27. *See* CEC's Memorandum at 6-7 (ECF Doc. No. 48-1).

As detailed below in our analysis of McWilliams' evidence of pretext, we find specific genuine issues of material fact raising an inference of racial discrimination, including evidence CEC treated Caucasian officers engaging in similar violations differently.

### *McWilliams shows genuine issues of material fact on pretext.*

CEC argues assuming McWilliams established a *prima facie* case of race discrimination, he cannot meet his burden under *McDonnell Douglas* of showing CEC's legitimate non-discriminatory reason for terminating him is pretext for discriminatory animus. *See* CEC's Memorandum at 8-10 (ECF Doc. No. 48-1). Under *McDonnell Douglas*, once the plaintiff establishes a *prima facie* case of discrimination, "the burden of production [then] shifts to the defendant to offer a legitimate non-discriminatory [justification] for the adverse employment action." *Burton*, 707 F.3d at 426 (citing *Smith v. City of Allentown*, 589 F.3d 684, 690 (3d Cir. 2009)).[7] If CEC meets its burden, under the *McDonnell Douglas* analysis the burden then shifts back to McWilliams "to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." *Id.* (citing *Fuentes v. Perskie*, 32 F.3d 759, 764-65 (3d Cir. 1994)). To show requisite pretext to defeat CEC's motion,

---

[7] The burden is "'relatively light' and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton,* 707 F.3d at 426 (quoting *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir.2006)).

McWilliams "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely that not a motivating or determinative cause of the employer's action." *Burton*, 707 F.3d at 427 (quoting *Fuentes*, 32 F.3d at 764).

Against the articulated pretext standards, we consider whether a reasonable factfinder could either discredit CEC's proffered reasons for McWilliams' termination or believe an invidious discriminatory reason is more likely than not a motivating or determinative cause of CEC's decision to terminate his employment.

McWilliams argues we cannot limit our analysis solely to termination based on his violating the "fraternization" policy, but we must consider the disparate manner in which CEC disciplines African American COs for a wide variety of perceived violations. McWilliams cites a variety of issues which do not challenge the legitimate non-discriminatory business reason for terminating his employment for fraternization but raises questions of different discipline standards for African American officers. McWilliams cites affidavits and deposition transcripts of other officers to argue doubts in the reasons proffered by CEC and a reasonable jury could conclude discrimination was the true motive underlying his termination. *See* McWilliams' Opposition at 10-15 (ECF Doc No. 49-1).

McWilliams offers the following evidence derived exclusively from the deposition testimony of fellow officer Frank Kwaning[8] regarding several instances of disparate treatment

---

[8] Kwaning is African American and is currently employed by CEC as a CO. *See* Kwaning Affidavit at ¶¶ 2-3 (ECF Doc. No. 49-9). Mr. Kwaning is a member of the Union and, since 2013, holds a position on the Executive Board of the Union. *Id.* at ¶4. In his position on the Executive Board, Kwaning is involved with grievances filed by COs with the Union and is familiar with the terms of the CBA and the enforcement of Prison policy. *Id.* Kwaning lodged numerous grievances and complaints regarding CEC's "improper administration of prison rules," including charges and grievances relating to discrimination. *Id.* Kwaning's Affidavit provides specific examples of disparate treatment between African American and Caucasian COs. *Id.* at ¶¶6-13.

between African American and Caucasian COs.[9] We find Kwaning's testimony raises at least one material issue: CEC terminated African American COs for theft and fraternization violations, as well as other policy violations, and did not terminate Caucasian COs for violating similar Prison policies. Kwaning also testified:

- CEC did not discipline a Caucasian CO for theft of food from an inmate. J.A. 390-91;

- CEC terminated an African American CO for theft, but did not investigate a Caucasian sergeant who allegedly stole an inmate's cell phone. J.A. 570-71;

- CEC did not discipline Caucasian COs for possession of guns found in their cars, while African Americans with guns in their cars were terminated for violating Prison policy. J.A. 485-87; Kwaning Affidavit at ¶9 (ECF Doc. No. 49-9);

- CEC did not discipline Caucasian COs for giving gifts such as sneakers, shoes and a television to inmates while an African American CO who gave sneakers to an inmate was terminated for violating the fraternization policy. J.A. 503-505, 508; Kwaning Affidavit

---

[9] Although the heart of McWilliams' race discrimination claim lies in the allegation CEC disciplined African Americans COs, but not Caucasian COs, for violations of Prison policies, McWilliams testified CEC did not always discipline him for being late to roll call citing at least on two occasions:

> Q. So all black employees are terminated for any infraction at all?
> A. Correct.
> Q. Then why weren't you terminated for all of the infractions you did before the January 2013 incident? You were late for roll call a couple times.
> A. Well, I fell under a different category.
> Q. What's that?
> A. Because I work with all the white guys, so I was like accepted.
> . . .
> Q. [B]ut you are black and you weren't terminated and you committed an infraction, correct?
> A. Right.
> Q. So all black COs are not terminated for every infraction that they commit. Otherwise, you would have been terminated for being late back in, I think it was 2009 and 2010.
> A. It was thrown out.
> Q. It might have been. But you said whenever you commit an infraction a black employee is terminated. It's not thrown out, they're terminated. But yours weren't, were they?
> A. Right.

J.A. at 152-153.

at ¶7 (ECF Doc. No. 49-9).[10] In violation of the fraternization policy, a Caucasian CO permitted an inmate (Caucasian) to make daily phone calls. Kwaning Affidavit at ¶ 8.

- CEC disciplined Kwaning for being late to roll call when he was not late, and, in one instance, intentionally caused Kwaning to be late when he was not late so as to create a basis for discipline, and CEC did not discipline Caucasian COs for lateness. J.A. 272-73, 317-37, 341-343, 426-28, 459-68, 508, 529-37, 573; Kwaning Affidavit at ¶6. McWilliams testified African American COs were disciplined for lateness while Caucasian COs were not disciplined for lateness (J.A. 155-56), and CEC issued McWilliams a verbal warning for clocking in late although he was not late pursuant to the CBA. J.A. 49, 81;

- CEC terminated African American officers for violating the policy regarding post abandonment, while not disciplining Caucasian officers for the same violation. J.A. 493-97; and,

- CEC terminated African American officers for sleeping on the job, while not terminating Caucasian officers for the same violation. J.A. 497-502, 512; Kwaning Affidavit at ¶ 11.

McWilliams relies on this evidence to assert pretext by showing race discrimination "was more likely than not the motivation behind the employer's actions" satisfied by evidence "the employer has previously discriminated against her [sic], that the employer has discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." *See* McWilliams Opposition at 9-10 (ECF Doc. No. 49-1). "Comparators may be used to discredit an employer's proffered reason for termination by showing 'that the employer treated other, similarly situated persons not of his protected class more favorably.'" *Petrikonis v. Wilkes-Barre Hosp. Co., LLC*, 582 F.App'x 126, 130 (3d Cir. 2014) (citing *Fuentes*, 32 F.3d at 765). McWilliams cites testimony from Kwaning and Simmons regarding instances of differing disciplinary treatment between African American and Caucasian COs, and McWilliams

---

[10] McWilliams also cites the affidavit of Roslynn Simmons ("Simmons"), currently employed by CEC as a CO. *See* Simmons Affidavit at ¶ 2 (ECF Doc. No. 49-7). Simmons is on the Union's Executive Board. *Id.* She testified to a lack of discipline imposed upon Caucasian officers giving gifts and advantageous treatment to inmates without discipline. *Id.* at ¶¶ 21-22.

identifies three Caucasian COs whom he contends deposited money into an inmate's commissary account but did not receive discipline.[11] J.A. 140-142.

CEC argues McWilliams fails to show pretext because its decision to terminate McWilliams is "firmly grounded" in CEC's policies, and there is no evidence for a jury to conclude CEC's reason for termination "unworthy of credence." CEC argues termination has been consistently applied in similar circumstances of fraternization, relying on Investigator Donald Beese's ("Beese") affidavit. J.A. 683-87, Beese Affidavit at ¶¶ 27, 37. To support Beese's affidavit regarding consistent application of the fraternization policy, CEC offers six comparator COs investigated for allegations of fraternization between January 2010 and January 2015 who separated from employment with CEC either by resignation or termination. Of these six comparators, CEC asserts four are Caucasian and two are African American.[12] CEC's proffer of six "fraternization" comparators does not meet its burden on summary judgment. While CEC offers these six comparators, it does not rebut Kwaning's testimony of specific instances where it did not similarly discipline Caucasian COs for fraternization and other offenses. As to McWilliams' comparators, CEC contends the three Caucasian COs cannot be comparators because "they did not commit a similar act" and the administration of CEC "had no knowledge

---

[11] Similarly, Simmons identified an instance where she observed Caucasian COs placing money into a Prisoner's commissary account who were not disciplined. Simmons Affidavit at ¶21 (ECF Doc. No. 49-7).

[12] We note CEC's documents provided to support the discipline of the six (6) comparators do not indicate the race of the individuals. We have no way of knowing, at least on the face of those documents, whether the racial make-up of these six comparators are four Caucasian and two African American as contended by CEC. We referred to the spreadsheet attached to CEC's Supplemental Brief to determine the race of these individuals. J.A.706-741. Although the spreadsheet generally supports CEC's representation of four Caucasian and two African Americans in the class of six comparators, we note that "Not Specified" is listed as the race for one of the six. J.A. 707.

10

of the alleged acts committed by these" COs. [13] CEC's Reply at 6 (ECF Doc. No. 50). CEC's "fraternization" policy is arguably vague on its face, which may lead to *de facto* disparate enforcement. These arguments raise fact issues precluding summary judgment.

McWilliams additionally cites statistics purportedly evidencing a "systematic" elimination of African American COs since 2009 in favor of increasing the number of Caucasian COs. *See* McWilliams Opposition at 1, 4 (ECF Doc. No. 49-1). While specific examples cited by Kwaning may, depending on proofs at trial, create some basis for pretext based on comparative discipline, we do not place any credence in McWilliams' repeated reliance on statistics, and fellow officer Roslynn Simmons' affidavit, which he believes shows CEC, within the first five months of 2009, terminated sixty (60) employees and 95% of those terminated were African American. We cannot allow such a statistic to inform our *McDonnell Douglas* race discrimination pretext analysis unless McWilliams can draw a nexus to his January 2013 termination. These statistics do not identify why persons departed employment. There are too many questions of fact created by CEC's ambiguous statistics of the race of "departed" employees for us to find widespread termination of African Americans COs. We see no such

---

[13] To support its argument, CEC submits the affidavits of the three COs identified by McWilliams as having deposited money into inmate accounts. Each affiant swears he "never placed money onto an inmate's commissary account." These statements only create fact issues in the face of McWilliams' sworn testimony of his personal knowledge these three COs did so. CEC argues the three COs identified by McWilliams are not comparators because McWilliams "concedes" CEC administration had no knowledge of any of their alleged comparative actions. McWilliams' testimony cited by CEC does not support its argument. McWilliams was asked: "Do you know whether anyone in administration knew that [CO] had transferred money into [inmate's] account?" McWilliams answered "No." We do not read this testimony as a "concession" by McWilliams the administration had no knowledge of the comparators' actions; we read McWilliams' testimony as he did not know whether CEC's administration knew of these alleged actions. In any case, this only highlights questions of fact precluding summary judgment.

nexus from the face of these statistics and do not find selective use of statistics on the population of COs is material to our summary judgment analysis.[14]

We find McWilliams adduces evidence raising questions of fact regarding CEC's proffered reason for his termination. Based largely on Kwaning's testimony as to different disciplinary treatment for fraternization violations based on the race of COs, we find genuine issues of material fact from which a jury could reasonably either disbelieve CEC's proffered legitimate non-discriminatory reason for terminating McWilliams or believe an invidious discriminatory reason was more likely than not a motivating or determinative cause of the termination.

### B. McWilliams adduced facts of hostile work environment sufficient to create a genuine issue of material fact.

McWilliams alleges CEC subjected him to a hostile work environment on the basis of his race in violation of Title VII and the PHRA by terminating him and "forcing him to bear witness to repeated acts of discrimination." Am.Compl. at ¶ 34 (ECF Doc. No. 35). A violation of Title VII may be shown by proving discrimination based on race created a hostile work environment. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66-67 (1986). To demonstrate a Title VII hostile work environment claim, McWilliams must establish: 1) he suffered intentional discrimination because of his race, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected him, 4) the discrimination would detrimentally affect a

---

[14] McWilliams asserts when CEC assumed operations on January 1, 2009, African Americans comprised 80-90% of corrections officers. *See* McWilliams' Opposition at 4. McWilliams testified to the downward population trend of African American officers and an upward trend of Caucasian officers since CEC assumed control of the Prison in 2009. J.A. 168-69. McWilliams testified Simmons showed him a list she kept of "all the COs that has been there since CEC started that's no longer there" and he observed in roll call a reduction in the number of African American COs. *Id.* Kwaning testified the racial profile of the Prison had changed from mostly African American COs to mostly Caucasian COs since CEC assumed control of the Prison. Kwaning Affidavit at ¶ 12. Simmons similarly testified to the racial profile of the Prison. Simmons Affidavit at ¶ 6.

reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).

"The Third Circuit has explained that, in order to prove a hostile work environment claim, a plaintiff must show that his workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Mingo v. Magic Hat Consulting*, No. 14-5433, 2015 WL 4578912, at *9 (E.D. Pa. July 30, 2015) (citing *Peace-Wickham v. Walls*, 409 F.App'x 512, 519 (3d Cir. 2010)) (internal quotations omitted). "The threshold for pervasiveness and regularity of discriminatory conduct is high." *Greer v. Mondelez Global, Inc.*, 590 F.App'x 170, 173 (3d Cir. 2014). To determine whether an environment is hostile, we "must consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Mandel*, 706 F.3d at 168 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)) (internal quotation omitted).

CEC argues McWilliams has not met the threshold inquiry of establishing intentional discrimination because there is no evidence it subjected McWilliams to an adverse employment action based upon his race; there is no evidence of a severe or pervasive hostile work environment detrimentally affecting McWilliams; and, there is no evidence CEC knew of harassment and failed to take action. CEC's Memorandum at 10-11 (ECF Doc. No. 48-1).

McWilliams' opposes CEC's motion for summary judgment on the hostile work environment claim asserting[15]:

---

[15] In its Reply, CEC argues McWilliams waived his claim for hostile work environment because his Opposition did not respond to CEC's argument in support of summary judgment on the hostile work environment claim. CEC Reply at 4 (ECF Doc. No. 50). In his Sur-Reply, McWilliams cites to pages 5 and 15, and corresponding footnotes with citations to the record, in support of his hostile work

- McWilliams, Kwaning and Simmons complained to "sergeants, lieutenants, captains, chiefs, assistant wardens, wardens, and corporate representatives;"

- his termination was "race related" because he spoke up about racial mistreatment to administration; he was warned about his "advocacy." Specifically, McWilliams testified he was told by a sergeant, captain, chief and warden to stop complaining about "what's going on in the jail." J.A. 155, 160;

- McWilliams complained to a sergeant about "stuff that would be bothering me because, you know, after a while it starts bothering you mentally . . .," including "like how it was unfair," "like certain things get written up, you know, for the same stuff that other officers get written up for and disciplined differently." McWilliams' provided an example of African American COs written up for being late to roll call, and a sergeant told him "just don't worry about that. That don't concern you [sic]." J.A. 155-156. The African American COs missed roll call because "the door was shut in their face." J.A. 156.

- Sometime in 2011, McWilliams worked with a Caucasian CO who was late to roll call, but who was not written up for being late; McWilliams complained to a sergeant, lieutenant and chief. J.A. 157-158. McWilliams spoke to Chief Byrne, currently the warden, regarding issues relating to African American COs being written up for lateness where Caucasian COs were not; African American COs being suspended for sleeping while Caucasian COs were not; different posts given to African American COs versus posts given to Caucasian COs; and issues relating to the canine unit. J.A. 138, 157-159;

- Around 2011, McWilliams wrote the warden a two-page letter "about what was going on and my concerns." McWilliams had a conversation with the warden about the letter in which McWilliams relayed his experience working at the Prison including "the COs being mistreated and the inmates being mistreated; how a lot of things need to be changed" and "just how things shouldn't be the way it is." J.A. 160-161;

- no corrective action was taken by CEC after receiving complaints, and the "behavior became worse and retaliatory" as described in Simmons' EEOC charge;

- CEC's progressive disciplinary policy is disparately administered. J.A. 152;

- CEC disciplined McWilliams for being tardy to roll call in 2009 when he was not. J.A. 81; and,

---

environment claim. McWilliams Sur-Reply at 20 (ECF Doc. No. 64). McWilliams "also notes that hostile work environment claims substantially overlap with discrimination claims and the proofs remain nearly identical." *Id.*

14

- the number of black officers dropped from 90% in 2009 to 25% in 2012. J.A. 168-169.

*See* McWilliams' Opposition at 5, 15 (ECF Doc. No. 49-1).

McWilliams additionally points to the following racially charged incidents:

- McWilliams told the warden in 2011 about an incident where Caucasian officers had access to computers in the control room and "how they would put different images up on the screen that was racial. And that was a problem." J.A. 160-162. These images included "a black person with a big nose and they would draw like nappy hair, like, on the character." J.A. 162. McWilliams objected to the images on the computer. J.A. 162-163.

- McWilliams testified to witnessing, in 2009 or 2010, Caucasian officers making racial slurs about an African American CO, Mazurla, on "canine." J.A. 163. McWilliams told the warden "about the situations on canine with how they chasing the black officers off the canine [sic], with racial pictures inside locker rooms. Just typical harassment of black officers just to push them off the unit and not wanting them to work on canine." J.A. 163. Specifically, McWilliams testified to Mazurla as the subject of racial slurs and teasing about his accent "every day till [sic] he got to the point where he just gave up canine and came back to working in the jail." J.A. 163-166.[16]

- McWilliams testified Angelina Blocker, an African American female CO who was elected president of the Union, showed him and others a photograph of herself with a noose. J.A. 174. McWilliams testified the photograph was in or near her locker. *Id.*

- McWilliams testified Mazurla told him, in 2010 or 2011, of images of nooses left in Mazurla's work locker. J.A. 174.

- McWilliams testified to having observed teasing of Officers Kwaning, Sangare, Bates, and Freeman, all from West Africa, for their accents. J.A. 174.

*See* McWilliams' Opposition at 5, 15 (ECF Doc. No. 49-1).

---

[16] In a second and third occasion when McWilliams observed Caucasian COs making fun of Mazurla's accent, McWilliams admittedly did not report the behavior. J.A. 165-166. However, McWilliams testified he later told a Sergeant Hamre about incidents relating to Mazurla, and subsequently told other Prison officials. J.A. at 166.

15

### *Intentional discrimination because of race and respondeat superior liability.*

We quickly dispose of two of CEC's arguments; as fully set forth above, we find a genuine issue of material fact regarding McWilliams' race discrimination claim and thus reject CEC's argument McWilliams has not met a threshold showing he was subject to an adverse employment action based upon his race. As to CEC's *respondeat superior* argument, we find McWilliams has pointed to enough evidence to satisfy this element. Simmons swears she made repeated written requests "to corporate concerning mistreatment and discrimination" and repeated verbal complaints to sergeants, lieutenants, investigators, human resources and the union, but no corrective action ever occurred. Simmons Affidavit at ¶ 19 (ECF Doc. No. 49-7). Kwaning swears, as a member of the Union's Executive Board, he "lodged numerous grievances and complaints (including charges with federal agencies) questioning the employer's improper administration of Prison rules," some of which "relate to discrimination." Kwaning Affidavit at ¶ 4 (ECF Doc. No. 49-9). McWilliams testified he complained about "the issues that was [sic] going on in the jail" to various sergeants and the warden and was told by a sergeant, captain, and chief to stop complaining. J.A. 155-157. At a minimum, there is record evidence of complaints regarding issues at the Prison and, as demonstrated by Kwaning's testimony, a history of different discipline imposed upon African American COs during the time of these complaints. We will allow the jury to determine whether CEC knew of specific instances of racial animus such as the noose photograph.

### *Severe or pervasive conduct.*

The more difficult question concerns whether McWilliams has shown severe or pervasive conduct regarding African American COs based on his testimony and the testimony of Kwaning

16

and Simmons.[17] McWilliams arguably shows frequent discriminatory conduct towards other persons and severity with disparate discipline through Kwaning's and Simmons' testimony. While McWilliams can rely on incidents known to Kwaning and Simmons to show hostile work environment, he must also show personal awareness of the cited incidents during his term of employment which could lead this Court to find a nexus between the hostile work environment in the workplace and his personal experience with discrimination. *Velez v. QVC, Inc.*, 227 F.Supp.2d 384, 410 (E.D.Pa. 2002). In a bedrock evidentiary sense, McWilliams must be competent to testify as to a severe or pervasive hostile work environment while he worked for CEC.

Evaluating the totality of circumstances includes the frequency of the offensive conduct and unreasonable interference with work performance. *Davis v. City of Newark*, 285 F.App'x 899, 902-03 (3d Cir. 2008) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). We also review whether a reasonable person in McWilliams' position would have found CEC's conduct "hostile or abusive." *Shramban v. Aetna*, 115 F. App'x 578, 580 (3d Cir. 2004) (citing *Harris*, 510 U.S. at 21). As such, isolated incidents, or sporadic comments, may be so "steeped in racial animus and instantly separates an African American from everyone else" to preclude us from finding, as a matter of law, CEC's alleged conduct is not severe or pervasive to the extent it changes the terms of McWilliams' employment. *Williams v. Mercy Health System*, 866 F.Supp. 2d 490, 502 (E.D.Pa. 2012); *But cf. Morgon v. Valenti Mid.-Atl. Mgmt.*, No. 01-134, 2001 WL 1735260, at *3 (E.D.Pa. Dec. 14, 2001) (a racial slur and a comment regarding plaintiff's national original not pervasive and regular). Courts have found a noose may create evidence of

---

[17] McWilliams' counsel's knowledge, gained from representing other African American employees, is not imputed to McWilliams while he worked for CEC. Kwaning and Simmons share the same counsel in bringing different lawsuits against CEC. Kwaning's testimony is primarily drawn from his deposition in his separate case against CEC, *Kwaning v. CEC*, C.A. No 15-928. Simmons is also suing CEC before this Court, *Simmons v. CEC*, C.A.No. 15-929.

racial animus, particularly in the totality of circumstances relating to other hostile acts. *Francis v. Atlas Machining & Welding, Inc.*, No. 11-6487, 2013 WL 592297, at *6-7 (E.D.Pa. Feb. 15, 2013) (citing *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1141 (10th Cir. 2008) (collecting cases)).

McWilliams adduced evidence of his knowledge, either direct or circumstantial, of frequent severe incidents in his workplace arguably suggesting a hostile work environment, as apparently also known to Kwaning and Simmons. Evaluating most of the incidents separately would not, as a matter of law, constitute a hostile work environment. For example, disparate treatment based on a wide variety of reasons over a year before McWilliams' departure, would not create a hostile work environment. *Boyer v. Johnson Mathey, Inc.*, No. 02-8382, 2005 WL 35893, at *14-20 (E.D.Pa. Jan. 6, 2005). Similarly, as McWilliams has provided only anecdotal evidence of his observations at roll call of an alleged reduction in the percentage of African American COs and a "list" kept by Simmons, shown to McWilliams, purporting to evidence separated African American COs, this statistical evidence alone could not lead a jury to find hostile work environment.[18] Much of McWilliams' evidence is based on comments made to others, and he offers no evidence of racial language or images directed to him.

In considering all the circumstances, one image so steeped in racial animus, can create questions of fact whether a reasonable African American corrections officer would find his work environment "hostile or abusive." This case takes on an entirely different patina when placed in the light of the noose photographs shown by two African American officers to McWilliams during his employment. We find a jury could reasonably believe the noose photographs, given our collective history, instantly separates an African American from everyone else. For example, we cannot envision a reaction to a noose photograph having a similarly severe effect on another

---

[18] *See* n. 14, *supra*.

race, particularly in the context of this Prison's alleged conduct towards African American corrections officers in the wide variety of situations cited by McWilliams, Kwaning and Simmons. Considering the totality of the circumstances and given the particularly severe nature of the noose photographs of African American colleagues shown to McWilliams, the disputed evidence could lead a jury to find a workplace polluted with racial animus. *Boyer v. Johnson Mathey, Inc.*, No. 02-8382, 2005 WL 35893, at *20 (E.D.Pa. Jan. 6, 2005).

We recognize other district courts have dismissed hostile claims based on references to KKK and burning crosses under the totality of circumstances in those cases.[19] We find this case, with a significant number of cited instances which presumably will be described to the jury, tips the balance towards allowing the jury to determine liability for hostile work environment. CEC has several factual defenses, particularly to its knowledge of, and possible interpretation, of the noose photograph in light of all the circumstances. A jury could also reasonably find CEC is not responsible for conduct of McWilliams' co-workers.[20] At this stage, McWilliams has adduced enough, and maybe just barely enough, evidence of genuine issues of material fact precluding summary dismissal under Rule 56 of the hostile work environment claim.

### III. Conclusion

In the accompanying Order, we deny CEC's motion for summary judgment on the race discrimination claim and hostile work environment claim. A reasonable jury can conclude CEC's proffered reasons for its adverse employment action are pretext for racial discrimination. A reasonable jury could also McWilliams knew of a severe or pervasive hostile environment in the

---

[19] *See Williams*, 866 F.Supp. 2d at 502, n. 10.

[20] McWilliams testified he complained to the warden about "racial pictures inside locker rooms" and "just typical harassment of black officers just to push them off the unit and not wanting them to work on canine," referring specifically to "one African guy named Mazurla." J.A. 163. Given this testimony, plus McWilliams' testimony that Mazurla told him about noose images left in Mazurla's work locker, there are at least some questions of fact regarding CEC's *respondeat superior* liability.

Prison towards African American corrections officers from 2009 until his termination. We dismiss any claim for punitive damages under the PHRA but allow punitive damages under Title VII subject to evidence at trial.